IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| ROBERT WALL and | : | CIVIL ACTION |
| LINDA WALL | : | |
| | : | |
| v. | : | |
| | : | NO. 16-1044 |
| ALTIUM GROUP, LLC | : | |

KEARNEY, J.                                                                       March 28, 2017

### MEMORANDUM

Investors signing a contract with a company promising them an annuity stream of income in exchange for the investors' lump sum payment are entitled to return of their lump sum if the company cannot produce the annuity. This is bedrock contract law. The defendant company will argue a third party caused their failure to perform and they have no control over the third party. The defendant company may also look to its attorney who opined as to the *bona fides* of the annuity before the investors turned over the lump sum payment. The company may be correct as to "someone else is liable" but their remedy is with the third parties. The defendant company has no legal right to withhold repayment of the lump sum under the contract with the investors. In the accompanying Order, we grant the investors' motion for summary judgment and deny the company's cross-motion.

### I.     Undisputed Facts

Bob and Linda Wall decided to invest in structured annuities which, for purposes of this case, are investments promising, in exchange for a lump sum payment paid to a settling personal injury plaintiff who otherwise would receive an annuity stream of income over time but who prefers to get paid now at a slight discount, the full settlement payment but over the annuity

term. The Walls' broker knew of a company selling these financial products, Altium Group LLC, which signs agreements with investors, like the Walls, to acquire these annuities from companies who purchase the annuity payments at a discount from injured individuals who settled their injury claims.

The Walls contracted with Altium to purchase a structured annuity from Florida resident Kenneth Stevens ("Stevens Annuity") who had settled a personal injury case in exchange for annuity payments.[1] Altium knew of the Stevens' Annuity through Corona Capital, a company buying and selling structured annuities.[2]

On November 8, 2011, the Walls and Altium signed a "Master Structured Settlement Receivable Purchase and Sale Agreement and Non-Circumvention Agreement" ("Agreement") to purchase the Stevens Annuity. "The purpose of this Agreement, and the intent of the Parties in entering into this Agreement is to establish the terms and conditions under which [Altium] will convey such streams of payment to [the Walls], and [the Walls] will purchase such streams of payment from [Altium]."[3]

The Agreement detailed the obligations and relationship between the Walls and Altium. The Walls agreed to pay Altium $5,000 within 48 hours of signing the Agreement.[4] Altium then agreed to purchase the Stevens Annuity from Corona Capital after the Florida state court approved Mr. Stevens' petition to transfer his rights to Corona. Altium agreed to send the Walls a "Closing Book" including "a certified copy of the final order approving the transfer."[5] The Walls agreed to pay the remainder of the purchase price within 48 hours of receiving the Closing Book.[6]

The parties agreed "[i]f court approval of a transaction is denied or if the Closing Book is not provided to [the Walls] within 180 days of the execution of the [Agreement]...[Altium]

2

will…immediately refund Payment One to [the Walls]…"[7] Altium also agreed when it presents the Closing Book, "[Altium] represents to [the Walls] that [Altium] has obtained its own independent professional due diligence review and approval of the transaction."[8]

The parties agreed New Jersey law governed the "validity, construction, and enforcement" of the Agreement "[i]n any action to enforce this Agreement, the prevailing party shall be awarded all…court costs and reasonable attorney's fees incurred."[9]

On November 8, 2011, the Walls wired Altium $5,000 under the Agreement.[10] On approximately January 17, 2012, the parties signed an addendum to their Agreement called a "Contract to Purchase Payment Rights."[11] The parties agreed this "Contract" served as an addendum to the Agreement.[12] In the Addendum, the parties described the receivable asset, "Kenneth Stevens Transfer," as "60 Monthly Payments of $3,000.00 per month from June 1, 2014 to May 1, 2019 with a 3.00% annual increase in payments."[13] "[The Walls] agree[] to purchase the Kenneth Stevens Transfer and [Altium] agrees to convey its interest in the Kenneth Stevens Transfer to [the Walls] subject to the… Agreement."[14]

On January 19, 2012, Altium and Corona Capital agreed Altium would buy the Stevens Annuity from Corona for $136,487.[15] Altium and Corona's January 19, 2012 agreement describes the receivable as "60 guaranteed monthly payments of $3,000 beginning on 06-01-2014 with a 3% annual increase through and including 05-01-2019."[16] Their agreement also recognizes the Walls as the "Subsequent Payee."[17] The parties agreed after Altium received the Closing Book from Corona, Altium will have 5 days to review the transaction and if it "identifies issues which materially increase the risk of loss" and if those issues cannot be remedied, either party can cancel the contract[18] Altium agreed when it accepted the Closing Book, "[Corona's] liability to [Altium] shall be limited to cases in which [Corona] has committed material fraud

3

upon [Altium]."[19]

On March 28, 2012, a Sumter County Florida circuit court judge approved Kenneth Stevens' petition to transfer his annuity payments to the Walls.[20]

On April 17, 2012, Altium's lawyer, Amy Rose Olivier, conducted the required due diligence review of the Stevens Annuity transfer.[21] Attorney Olivier opined "[b]ased upon my review of these documents, and the referenced communications, it is my opinion that the annuity issuer and annuity owner will assure that the payment stream is paid to the Final Assignee."[22] Attorney Olivier describes the Walls as "Final Assignee."[23]

With its lawyer's approval, on April 19, 2012, Altium presented the Closing Book for the Stevens Annuity to the Walls.[24] The Closing Book lists the purchase price of $152,833.37 and describes the assigned payments as "60 monthly payments of $3,000.00 from 6/1/2014 to 5/1/2019 with 3% annual increase in payments."[25] Complying with the Agreement, on April 23, 2012, the Walls wired the remainder of the purchase price, $147,851.37, to Altium.[26]

Almost two years later, on April 15, 2014, a circuit court judge in Sumter County granted Kenneth Stevens' motion to set aside the March 28, 2012 Order approving the transfer of the Stevens Annuity because Kenneth Stevens did not sign or see any of the documents submitted in the petition to transfer his annuity.[27]

The Walls paid Altium $152,833.37. The Walls never received "60 monthly payments of $3,000.00 from 6/1/2014 to 5/1/2019 with 3% annual increase in payments."[28] Altium never repaid the $152,833.37 to the Walls. The Walls sued Altium.

## II.   Analysis

The Walls and Altium both moved for summary judgment.[29] The Walls argue Altium breached the Agreement and are entitled to $152,833.37 plus attorneys' fees and pre-judgment interest.  Altium argues it does not have a contractual obligation to make 60 payments to the Walls, and in the alternative, Altium is excused from any contractual obligations through the doctrines of impracticability of performance and frustration of contractual purpose. We find, as a matter of law, the Walls and Altium had a contract and Altium breached by failing to perform its obligation because the Walls never received the Stevens Annuity's "60 monthly payments of $3,000.00 from 6/1/2014 to 5/1/2019 with 3% annual increase in payments."[30] We may award attorneys' fees and prejudgment interest subject to a timely petition from the Walls. We dismiss the Walls' unjust enrichment claim as moot.

### A.   Altium breached the Agreement.

The Walls and Altium's Agreement "establish[ed] the terms and conditions under which [Altium] will convey such streams of payment to [the Walls], and [the Walls] will purchase such streams of payment from [Altium]."[31] The parties signed an Addendum obligating the Walls to pay Altium $152,833.37 and Altium agreed to transfer the receivable asset, "Kenneth Stevens Transfer," as "60 Monthly Payments of $3,000.00 per month from June 1, 2014 to May 1, 2019 with a 3.00% annual increase in payments."[32]

To state a breach of contract claim, the Walls must prove: (1) existence of a contract; (2) breach of a duty imposed by the contract; and (3) damages arising from such breach.[33]

We find, as a matter of law, the Walls and Altium have a contract defined by their Agreement.  We find, as a matter of law, Altium breached its duty under the Agreement because the Walls never received the 60 monthly payments or their $152,833.37 returned from Altium.

5

We find, as a matter of law, the Walls suffered $152,833.37 in damages.

Altium argues the Walls "failed to identify any provision of the...Agreement or...Addendum that created the contractual obligation" to provide 60 monthly payments.[34] Altium argues it satisfied its duty under the Agreement by transferring its interest in the Stevens Annuity to the Walls. Altium cites no supporting case law to support its argument and we cannot find cases supporting its position. The Agreement's remedy language confirms Altium has a contractual obligation to the Walls because the parties agreed Altium must refund the Walls if the court did not approve the annuity transfer or Altium failed to provide the Closing Book to the Walls.[35]

Altium's obligations to the Walls did not end on April 23, 2012 when Altium presented the Closing Book to the Walls and the Walls paid $152,833.37. We recognize Altium then paid the Walls' money to Corona Capital and eventually to Kenneth Stevens (or the person fraudulently signing his name); however, Altium breached its contractual obligation to the Walls and must pay the damages. There is a signed contract for Altium to arrange a monthly stream of income in exchange for $152,833.37. The Walls paid the consideration. Altium's lawyer approved the *bona fides* of the Stevens Annuity. Altium did much more than simply acquire a signature as a middle man. It, through its Agreement and its lawyer's approval, stood behind the consideration. It now must repay the Walls as the promised return consideration never materialized. Altium can elect to pursue recovery from Corona Capital and others.

### B. Altium's affirmative defenses fail as a matter of law.

After arguing there is no contract, Altium argues two affirmative defenses, impracticability of performance and frustration of contractual purpose, attempting to excuse the breach of its duty under the Agreement.

6

### 1. Background of contractual affirmative defenses.

Impracticability of performance and frustration of contractual purpose arise when an unknown supervening event fundamentally alters the nature of the parties' contract but apply to different factual events. New Jersey law treats impracticability (or impossibility) of performance and frustration of contractual purpose as "doctrinal siblings within the law of contracts."[36] The doctrines alleviate or excuse a party's obligation based on a supervening event, and the "event must be one that had not been anticipated at the time the contract was created, and one that fundamentally alters the nature of the parties' ongoing relationship."[37]

Impracticability of performance applies where the supervening event, not contemplated by the parties and outside their control, rendered a party's performance "literally impossible, or at least inordinately more difficult."[38] "Even if a contract does not expressly provide that a party will be relieved of the duty to perform if an unforeseen condition arises that makes performance impracticable, 'a court may relieve him of that duty if performance has unexpectedly become impracticable as a result of a supervening event.'"[39]

Frustration of contractual purpose looks at the parties' purpose in making their contract, and does not examine the (in)ability of a party to perform his or her contractual obligation. It applies where a supervening event fundamentally changes the nature of a contract "mak[ing] one party's performance worthless to the other, frustrating his purpose in making the contract."[40] The classic example is *Krell v. Henry*, the hornbook "coronation case" where Mr. Henry rented a room from Mr. Krell for the sole purpose of viewing King Edward VII's coronation.[41] The King fell ill and postponed the coronation. The purpose of the parties' contract is a room with a view of the coronation and the cancellation fundamentally changed the common object of their contract, frustrated their purpose, and excused performance.

Altium raises both defenses; however, impracticability of performance is the applicable defense because at the time Altium presented the Closing Book to the Walls, Altium owned the Stevens Annuity. The supervening court order affected Altium's performance, not the purpose of the Agreement. Frustration of contractual purpose does not apply because the parties did not contemplate an outside event in the future instead, they agreed the Walls would pay Altium $152,833.37 and Altium would guarantee "60 Monthly Payments of $3,000.00..." and had its counsel review and approve the transfer.[42]

## 2. Impossibility of performance does not excuse Altium from restitution.

There is no dispute the supervening event of underlying fraud in Stevens' Annuity transfer rendered Altium's performance impossible but it does not excuse Altium from restitution.

The Restatement (Second) of Contracts' chapter on "Impracticability of Performance and Frustration of Purpose" recognizes "[i]n any case governing by the rules stated in this Chapter, either party may have a claim for relief including restitution."[43] In *Facto*, a couple prepaid a banquet hall for their wedding reception.[44] Approximately an hour into the reception the electricity went out and the banquet hall could not serve meals or drinks and eventually the banquet hall manager cleared out all guests around 9:30pm, an hour and a half before the agreed upon 11pm end.[45] The Superior Court Appellate Division affirmed the trial court and held the power outage excused the banquet hall from performance under the contract.[46] But the Appellate Division reversed the trial court's conclusion the banquet hall is entitled to keep the couple's prepayment because the banquet hall did not breach the contract.[47] "[T]he power failure that relieved the [banquet hall] of the obligation to furnish [the couple] with a wedding reception also relieved [the couple] of the obligation to pay the contract price for the reception."[48] The court

8

remanded for a determination how much the banquet hall's services were valued for their partial performance under *quantum meruit*.[49]

We find the supervening event, the underlying fraud in the Stevens Annuity transfer, made Altium's performance impossible. While we are not entirely satisfied the underlying fraud is "one that had not been anticipated at the time the contract was created" because Altium sought protection against possible irregularities in its agreements and its lawyer's due diligence, we find Altium's duty to make restitution is not excused.[50]

Our finding Altium is excused from performance does not mean Altium gets to keep the Walls' money. Altium did not perform any part of its obligation to the Walls, unlike the banquet hall in *Facto*, where the banquet hall partially performed because the outage excused its performance and the court still ordered the banquet hall to make restitution of the couple's prepayment minus the cost of partial performance.[51] Altium must return the $152,833.37 to the Walls because "[e]ven though the nonperforming promissee is not in default because impossibility doctrine discharges the duty, it cannot demand something for nothing from the other party."[52]

### III. Conclusion

In the accompanying Order, we grant the Walls' motion for summary judgment on their breach of contract claim and we deny Altium's cross-motion. We dismiss the Walls' unjust enrichment as mooted by finding a contract existed.

---

[1] ECF Doc. No. 81 at 106.

[2] ECF Doc. No. 85 at 116-117.

[3] ECF Doc. No. 85 at 87.

9

[4] *Id.* at 88.

[5] *Id.*

[6] *Id.*

[7] *Id.* at 89.

[8] *Id.*

[9] *Id.* at 90.

[10] *Id.* at 105.

[11] ECF Doc. No. 81 at 13.

[12] ECF Doc. No. 85 at 143.

[13] *Id.*

[14] *Id.*

[15] ECF Doc. No. 81 at 17.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 18.

[19] *Id.*

[20] ECF Doc. No. 85 at 16-20.

[21] *Id.* at 61.

[22] *Id.* at 62.

[23] *Id.* at 61.

[24] *Id.* at 44.

[25] *Id.*

[26] *Id.* at 106.

[27] ECF Doc. No. 81 at 85-87.

[28] *Id.*

[29] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle*, 435 F.3d at 264 (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[30] *Id.*

[31] ECF Doc. No. 85 at 87.

[32] *Id.* at 143.

[33] *See Accurate Abstracts, LLC v. Havas Edge, LLC*, No. 14-1994, 2015 WL 5996931, at *4 (D.N.J. Oct. 14, 2015)( *citing Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL–CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013). The November 8, 2011 Agreement identifies the governing law of New Jersey. Both parties cite Pennsylvania case law in their briefs. We find no major difference in Pennsylvania and New Jersey law regarding breach of contract and defenses of impracticability of performance and frustration of contractual purpose and rely on New Jersey law per the parties' Agreement. *Cf. Granite Companies, LLC v. City Capital Corp.*, No. 07-3078, 2008 WL 3285914, at *2 (E.D. Pa. Aug. 8, 2008)(*citing Sampathachar v. Fed. Kemper Life Assurance Co.*, 186 Fed. Appx. 227 (3d Cir.2006)) and *Accurate Abstracts*, 2015 WL 5996931, at *4 (internal citations omitted).

[34] ECF Doc. No. 80 at 50.

[35] *Id.* at 89.

[^36]: *JB Pool Mgmt., LLC v. Four Seasons at Smithville Homeowners Ass'n, Inc.*, 67 A.3d 702, 708 (N.J. App. Div. 2013)

[^37]: *Id.* at 709 (citing *Edwards v. Lepoldi*, 89 A.2d 264 (N.J. App. Div. 1952)(*certif. denied*, 91 A.2d 671 (1952))

[^38]: *Id.* (citing *Facto v. Pantagis*, 915 A.2d 59 (N.J. App. Div. 2007) and *M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 794 A.2d 141 (N.J. 2002)).

[^39]: *Facto*, 915 A.2d at 61.

[^40]: *Id.* at 709-10 (quoting Restatement (Second) of Contracts § 263 (1981)).

[^41]: *Krell v. Henry*, 2 K.B. 740 (1903).

[^42]: ECF Doc. No. 85 at 143.

[^43]: Restatement (Second) of Contracts § 272 (1) (1981)

[^44]: *Facto*, 915 A.2d at 60.

[^45]: *Id.*

[^46]: *Id.* at 63.

[^47]: *Id.*

[^48]: *Id.*

[^49]: *Id.*

[^50]: *See JB Pool*, 67 A.3d at 709. Specifically, Altium agreed presenting the Closing Book to the Walls is a representation Altium acquired "independent professional due diligence review and approval of the transaction." ECF Doc. No. 85 at 41. Altium hired Attorney Olivier, who allegedly conducted a due diligence review of the documents and communications and approved the transfer of Stevens' Annuity. *Id.* at 62. We have no evidence of Attorney Olivier's efforts to contact Mr. Stevens to confirm the *bona fides*, but those issues may be for another forum. Mindful it may be buying bad paper, Altium also protected itself from possible loss in purchasing the Stevens Annuity from Corona. ECF Doc. No. 81 at 17. Altium exercised its contractual right to conduct due diligence to "identif[y] issues which materially increase the risk of loss" by Corona. *Id.* at 18. Altium even reserved a future cause of action against Corona in "cases in which [Corona] has committed material fraud upon [Altium]." *Id.* When Altium presented the Walls with the Closing Book in April 2012, it had, *albeit* ineffectively, taken measures to protect itself from irregularities with the Stevens Annuity transfer.

[51] *Facto*, 915 A.2d at 63.

[52] *Id.*